**Jordan K. Cameron (12051)**
  *jcameron@djplaw.com*
**DURHAM JONES & PINEGAR, P.C.**
3301 N Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600
Fax: (801) 375-3865

<u>**Attorneys for Plaintiff XMission, L.C.**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>    Plaintiff,<br><br>vs.<br><br>FLEX MARKETING GROUP, LLC, a New York limited liability company, DOES 1-10,<br><br>    Defendants. | **COMPLAINT**<br><br><br><br><br>Case No.: 2:20cv00282<br><br>Judge Cecilia M. Romero |

COMES NOW Plaintiff XMission, L.C. ("XMission"), and complains and alleges the following:

PARTIES

1.    Plaintiff, XMission, L.C., is a Utah limited liability company with its principal place of business in Salt Lake City, Utah, and at all relevant times hereto was duly registered and licensed to do business in the State of Utah.

2.    Defendant Flex Marketing Group, LLC (hereinafter "Flex") is a New York limited liability company.

3. On information and belief, DOES 1-10 are individuals and companies who act as agents for Flex in the processing and publishing of e-mail advertisement with the purpose of generating revenue for Flex.

## JURISDICTION AND VENUE

4. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), for violations of the 15 U.S.C. §7701 *et seq.* (CAN-SPAM Act of 2003), and pursuant to 15 U.S.C. § 7706(g)(1) (original jurisdiction) for cases involving a civil action by an internet access service adversely affected by a violation of 15 U.S.C. §7704(a)(1), 15 U.S.C. §7704(b), or 15 U.S.C. § 7704(d), or a pattern and practice that violates subparagraphs (2), (3), (4), and/or (5) of 15 U.S.C. § 7704(a)

5. This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, because the claims relate to and arise out of the same course of conduct, and form part of the same case and controversy, as the claims over which this Court has original jurisdiction.

6. This Court has personal jurisdiction over the Defendants because the Defendants directly or through their agents have knowingly taken actions, or failed to act, in manners that have directly caused harm to XMission in Utah, and/or have purposefully availed themselves of the privileges of conducting commercial activity in the forum state, including through contracts, and through the sending of thousands of commercial e-mails into the state. The exercise of jurisdiction is reasonable as Defendants should have known that they would be subject to the jurisdiction and laws of the forum state when they either entered into a contract with XMission in Utah and failed to honor the terms of the contract, thereby causing harm to XMission in Utah,

SLC_4995376.1

and/or sent, or caused the commercial e-mails to be sent to customers of an e-mail service provider located in Utah. Further, jurisdiction is acquired through service of process pursuant to Utah Code § 13-11-6.

7. A substantial part of the unlawful actions by the Defendants, and each of them, occurred in this judicial district. Therefore, venue is proper pursuant to 18 U.S.C. §1391..

## GENERAL ALLEGATIONS

8. XMission was founded in 1993 as Utah's first dial-up Internet Service Provider ("ISP").

9. From its early days as a private, Utah ISP, to its current role as a global business Internet provider, XMission has expanded its technical offerings to include sophisticated cloud hosting, web hosting, e-mail service and hosting, collaboration tools, business VoIP phone service, and high speed internet connectivity solutions including optical Ethernet, copper and fiber.

10. Throughout its history, XMission has also worked with hundreds of Utah's nonprofit organizations by providing free web hosting services, and by sponsoring a variety of community-based events and facilities.

11. XMission is a widely known and well-recognized ISP in Utah.

12. XMission owns all the servers, routers, and switches on its network through which it hosts and provides its Internet access services for its customers.

13. XMission has an expansive network and infrastructure, which it has had to consistently update, upgrade, and augment in order to combat ongoing spam problems.

14. XMission is the sole owner of all its hardware, and has complete and uninhibited access to, and sole physical control over, the hardware.

15. As a legitimate and leading ISP, XMission is a bona fide Internet Access Service ("IAS") as that term is defined under 15 U.S.C. §7702(11) and 47 U.S.C. §231(e)(4).

16. XMission provides Internet access services to both commercial and residential customers.

17. The e-mail accounts hosted and served by XMission include e-mail accounts owned by third-party customers of XMission, e-mail accounts owned by employees and/or customers of XMission's third-party customers, e-mail accounts owned by employees of XMission, and also e-mail accounts owned by XMission itself.

18. For purposes of this Complaint, "spam" is defined as commercial e-mail.

19. From early January, 2015 through around August 16, 2015, XMission received many spam e-mails, sent and/or initiated by Flex or through Flex's marketing network, including Flex's agents/publishers.

20. In August 2015, XMission filed a lawsuit against Flex in Case No. 2:15cv0590 in the United Stated District Court for the District of Utah arising out of its unlawful e-mail practices and activity. Flex appeared and defended in that lawsuit in Utah.

21. The lawsuit put Flex on notice of the harm it was causing to XMission in Utah through its commercial e-mail practices and activity.

22. Later in 2015, Flex requested that XMission provide Flex a list of every domain for which it provided e-mail hosting services on its servers in Utah.

23. The parties agreed that if XMission provided the list, Flex would add the domains to Flex's e-mail suppression list, and the Flex would publish the list to Flex's marketing agents.

24. The intent of the agreement was to cease e-mail traffic to XMission's domains in Utah through Flex and Flex's agents.

25. XMission had authority through its customer contracts to opt-out of commercial e-mails for its customers.

26. In providing the domains, XMission expressly opted out from receiving any future e-mail through Flex and Flex's agents as allowed under 15 U.S.C. §7704(a)(4).

27. Flex maintains relationships with advertisers to market the advertiser's products and websites pursuant to cost-per-click, or cost-per-lead, type arrangements.

28. A cost-per-click arrangement is an online advertising pricing model where a marketer generates a link to an advertiser's product or website, and earns money each time a consumer clicks a link.

29. A cost-per-lead arrangement is an online advertising pricing model where the marketer generates a link to an advertiser's product or website, and earns money each time advertiser pays for a sign-up from a consumer generated through the marketer's link.

30. To disseminate the links to a wide audience, Flex retains agents, also called publishers, and manifests assent to those agents/publishers to act on Flex's behalf and subject to Flex's control to disseminate the marketing campaigns that Flex provides, and generate income for Flex through clicks.

31. In turn, Flex's agents/publishers manifest assent to Flex and otherwise consent to act on Flex's behalf by disseminating the marketing campaigns that Flex provides, and generate income for Flex through clicks.

32. Simply, Flex is in the business of soliciting consumer transactions for its advertiser clients directly and through its agents/publishers.

33. Flex controls the content of the marketing campaigns and provides the method for its dissemination to its agents/publishers.

34. In 2019, in breach of the parties' agreement, and in violation of Federal and Utah law, Flex and/or its agents, sent at least 6,868 spam e-mails to e-mail addresses that included, in part, domains provided to Flex by XMission for the sole purpose of ensuring that XMission never receive any e-mails through the efforts of Flex or its agents/publishers.

35. Flex, and/or Flex's agents sent the spam e-mails to the XMission domains in order to generate click income for Flex.

36. The spam e-mails adversely affected XMission, and contributed to an overall spam problem suffered by XMission in Utah.

37. Each of the Defendants is an "initiator" of the spam e-mails messages as they either transmitted or procured the transmission of the e-mails in question as such term is defined in 15 U.S.C. § 7702 and 7706(g)(2).

38. On information and belief, the Defendants individually or acting in concert with each other, sent additional spam e-mails that XMission has been unable to connect directly with them due to the misleading nature of the information in the e-mails.

39. Each of the e-mails is a commercial message and contains commercial content.

40. The e-mails, and each of them, were received by XMission on its mail servers located in Utah.

41. Throughout its business, XMission has expended significant sums of money in hardware acquisition, maintenance and related expenses to increase capacity to deal with increased spam and related harm, spam filtering expenses, and employee time in dealing with problems caused by its receipt of spam generally.

42. On average, XMission expends hundreds of thousands of dollars per year in dealing with spam related issues and associated employee time, exclusive of attorney fees.

43. The harm XMission continues to suffer, as the result of its collective spam problem, is much more significant than the mere annoyance of having to deal with spam or the process of dealing with spam in the ordinary course of business (i.e., installing a spam filter to flag and discard spam).

44. The harm XMission suffered, and continues to suffer, is manifested in financial expense and burden significant to an ISP; lost employee time; lost profitability; the necessity to purchase and dedicate equipment specifically to process spam that could otherwise be dedicated providing internet access services; harm to reputation; and customer and e-mail recipient complaints.

45. Each of the e-mails in question violates at least one provision of the CAN-SPAM Act.

FIRST CAUSE OF ACTION<br>**BREACH OF IMPLIED CONTRACT**

46. Each of the previous paragraphs is realleged herein.

47. In 2015, XMission and Flex reached an agreement through mutual assent.

48. The parties mutually assented to the following:

   a. XMission would provide Flex a list of every domain for which it provided e-mail hosting services on its servers in Utah;

   b. Flex would ensure that all commercial e-mailing to XMission's customers ceased by adding the domains to Flex's e-mail suppression list and publishing the list to Flex's agents;

   c. Flex would not use the domains for any other purpose.

49. The intent of the agreement was to cease e-mail traffic to XMission's domains in Utah through Flex and Flex's agents/publishers.

50. Flex breached the agreement at least in 2019 by failing to suppress e-mails to XMission's customers and through the dissemination of commercial e-mails to XMission customers that included domains provided by XMission for suppression.

51. As the result of Flex's breach of contract, which included Flex's failure or omission to properly suppress email domains or publish the domains to its agents, XMission suffered harm in Utah.

52. The amount of damages to be awarded for the harm XMission suffered shall be determined at trial.

SECOND CAUSE OF ACTION
**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(1)**

53. Each of the previous paragraphs is realleged herein.

54. The CAN-SPAM Act makes it unlawful to send e-mail messages that contain, or are accompanied by, materially false or materially misleading Header Information.

55. An e-mail header is materially misleading when it impairs the ability of an Internet access service processing the message on behalf of a recipient to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

56. Header information includes a "from" line.

57. The "from" line is the line identifying or purporting to identify a person initiating the message.

58. The party responsible for the e-mail determines what the "from" line will be.

59. By apparent design, at least 6,851 e-mails in question contain "from" names that are false.

60. In most cases, the friendly "from" (or the portion the displays to the recipient), is spoofed and, instead of identifying someone responsible for the e-mail, actually identifies the recipient.

61. The e-mails are designed to appear as if they were set from the person who received it. In other words, that they are emails that the recipient sent to his or herself.

62. In other cases, the "from" names identify recognizable companies, such as Bank of America, who have nothing to do with the e-mails.

63. Accordingly, XMission prays for relief in the amount of $100 per violation of 15 U.S.C § 7704(a)(1) pursuant to 15 U.S.C. § 7706(g)(3).

THIRD CAUSE OF ACTION
**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(4)**

64. Each of the previous paragraphs is realleged herein.

65. The CAN-SPAM Act permits a recipient of e-mail to opt out of receiving commercial e-mails from any sender.

66. If such a request is made, then it is unlawful for the sender—or anyone acting on their behalf—to send or assist in initiating the transmission of a commercial e-mail to that recipient more than 10 days after the request.

67. XMission's *Terms of Service* allow it to unsubscribe from e-mail traffic for its customers.

68. In 2015, XMission, acting on behalf of its customers, opted out of any future e-mail from Flex or Flex's agents.

69. Despite its opting-out in 2015, in 2019, Flex either directly or through its agents, failed to honor the opt-out request and transmitted thousands of e-mails to XMission's customers.

70. Accordingly, XMission prays for relief in the amount of $25 per violation of 15 U.S.C § 7704(a)(4) pursuant to 15 U.S.C. § 7706(g)(3).

## FOURTH CAUSE OF ACTION
### CAN-SPAM ACT, 15 U.S.C. § 7704(a)(5)

71. Each of the previous paragraphs is realleged herein.

72. The CAN-SPAM Act requires that every commercial e-mail contain (1) a clear and conspicuous identification that the message is an advertisement or solicitation; (2) a clear and conspicuous notice of the opportunity to opt-out; and (3) a valid physical postal address of the sender. *See* 15 U.S.C. § 7704(a)(5)(A).

73. 6,860 e-mails fail to contain any physical address, or any accurate physical address, of a sender, in the body of the e-mail.

74. 6,859 e-mails fail to contain an advertisement notice.

75. The foregoing amounts to 13,719 violations of 15 U.S.C. § 7704(a)(5).

76. Accordingly, XMission prays for relief in the amount of $25 per violation of 15 U.S.C § 7704(a)(5) pursuant to 15 U.S.C. § 7706(g)(3).

FIFTH CAUSE OF ACTION
**UTAH CONSUMER SALES PRACTICES ACT, UTAH CODE § 13-11-1**

77. Each of the previous paragraphs is realleged herein.

78. The e-mails in question are solicitations and therefore qualify as consumer transactions.

79. The Defendants are in the business of soliciting consumer transactions and qualify as suppliers.

80. It is a deceptive act or practice by a supplier in connection with a consumer transaction, whether such occurs before, during, or after the transaction, for the supplier to knowingly or intentionally indicate that the subject of the transaction or the supplier has sponsorship or affiliation that does not exist.

81. Here, Defendants, acting as suppliers, caused the transmission of thousands of commercial e-mails that contained "from" lines that intentionally indicated that the solicitation was from the party identified in the "from" line.

82. However, each of the "from" lines was false.

83. In falsely identifying who the solicitations were from, the Defendants expressly represented or implied that the solicitation had a sponsorship or affiliation that did not exist.

84. XMission customers have assigned the right to pursue claims arising from the receipt of spam e-mails to XMission.

85. The foregoing resulted in 6,868 consumer transactions that affected XMission customers.

86. XMission seeks damages pursuant to Utah Code § 13-11-19 in the amount of $2,000 per consumer transaction.

## REQUEST FOR RELIEF

Plaintiff respectfully requests the following relief:

A. Entry of judgment for breach of implied contract in an amount to be determined at trial.

B. Entry of judgment in the amount of $100 per violation of 15 U.S.C. § 7704(a)(1).

C. Entry of judgment in the amount of $25 per violation of 15 U.S.C. § 7704(a)(4).

D. Entry of judgment in the amount of $25 per violation of 15 U.S.C. § 7704(a)(5).

E. Treble damages pursuant to 15 U.S.C. § 7706(g)(3).

F. Entry of judgment in the amount of $2,000 per consumer transaction pursuant to Utah Code § 13-11-19.

G. Attorneys' fees and costs pursuant to 15 U.S.C. § 7706(g)(4).

H. Pre and post-judgment interest at the highest rate permitted by law.

I. Entry of permanent injunction against each Defendant prohibiting each Defendant from sending or causing to be sent e-mail messages to XMission and its customers.

J. All other relief deemed just in law or equity by this Court.

DATED this 27th day of April, 2020.

                                                     DURHAM JONES & PINEGAR, P.C.

                                                    /s/ Jordan K. Cameron
                                                    Jordan K. Cameron
                                                    *Attorneys for Plaintiff*

Plaintiff's Address:
51 East 400 South
Suite 200
Salt Lake City, Utah 84111